We're happy to hear your argument in our third case, number 19-1977, Western Star Hospital Authority v. City of Richmond. Counsel, whenever you're ready. Good afternoon, Your Honors. Counsel, may it please the Court, Luke Haskamp on behalf of Appellant Western Star Hospital Authority, doing business as Metro Health PMS, which is how we refer to the parties. Thank you for the opportunity to be here today. Your Honor, subject to your questions, of course, I'll try to focus on our monopolization claims and specifically two key issues relating to state action immunity. One is the clear articulation standard, and two is the market participant exception. Now, with respect to the first, the ultimate question is whether the City of Richmond and the Richmond Ambulance Authority have acted pursuant to a clearly articulated state policy to displace competition in the market for non-urgency transport. That's the standard they have to meet to be entitled to state action immunity. And when you look at Virginia's entire statutory scheme, you see that the focus is on emergency medical services, setting up a statewide system so there's a plan in place when someone faces a medical emergency, that when a person dials 911, someone responds. The statute isn't addressing non-emergency services. And when you consider that as well as the directives of the Supreme Court to narrowly circumscribe this disfavored doctrine, state action immunity should not be available here. On the second issue, that is just whether to apply a market participant exception. And the rule we propose is a straightforward one. If the municipality is acting as a regulator, immunity may apply. But the minute it steps into the market, engages in commercial activity, it's treated like other private actors. That is, it just can't engage in anti-competitive conduct. It has to play fair like other participants. Has any court of appeals adopted such a theory? Not explicitly, Your Honor. No, there's a little lack of clarity. There are courts that have, I think, at least implicitly endorsed it in dicta, or explicitly endorsed it in dicta. And there are courts... Well, there are courts that have said it might exist, or could exist, or possibly in another case it could exist. Nobody has said it does exist. Correct. No, no. But there are courts that have adopted the exception in other contexts, including this court. So, counsel, if you... Let's assume you do not prevail on the first part, the first point you made, that we think there is a sufficiently clearly articulated policy. Are you saying that you need... I know you made other arguments, and we can talk about them. But by going to the market exception, it sounds like that's a tacit acknowledgement that you really need that in order to prevail, so long as there is a clearly articulated state policy to displace competition among this type of non-emergency use. Am I understanding where you're going correctly? Yes, Your Honor. That's correct. I would frame it as we think we can... We only need to win on either of those points to get this sent back. But you have to win on one or the other of those points. Absolutely. Yes, yes. And Metro Health can... Even if we lose on the clear articulation standard, we still could prevail on the market participant exception. This court recognizes that. Regardless of if the city and RAA are acting pursuant to a clearly articulated policy, we think a separate... This additional rule should apply when they step out into the marketplace. Well, counsel, I get that there are kind of comments that that exception might apply, you know, both from the Supreme Court and the preemption case that you referred to from our court. And I think it's fair to say that that theory hasn't been rejected by our court or the Supreme Court. But if that theory were kind of baked in to the Sherman Act and its law, Hallie couldn't stand and Phoebe Putney couldn't stand, could it? Or could they? Certainly, you're right. I mean, Hallie is a great case to talk about. There's... I'm sorry, you said Hallie and Phoebe Putney. Both of those cases... Yeah, I mean, aren't the municipalities in there or political organizations related to the municipalities, aren't they market participants in both of those cases? Yes, they are, Your Honor. And then it goes back to the judge's original question to you. We have to be overruling those cases. No, Your Honor, I'm sorry. I don't think you do. Neither of those cases, I think, explicitly rejected those, what the rule we'd be proposing here. They implicitly rejected it because a market participant was involved, right? I think there in... Yes, Your Honor, but I think there they were acting in Hallie that the parties were acting to a clearly articulated... Right, we were talking... Got it. I'm sorry. Yes, I see your question here, Your Honor. But I think the concern that we've seen with the Supreme Court that's developed over the last few years with the North Carolina Board of Dental Examiners case and the Phoebe Putney case, we're seeing this evolving concern about market participation. People... Well, of course, North Carolina, the regulators were private. They weren't. But so it's not the same situation as we're here where we have a public entity, right? Absolutely, that's correct, Your Honor. But I think what was important in the North Carolina case was really the activity in which they were engaged. That the, quote, real danger that when an actor is participating in the market, he or she or it is able to act in furtherance of its own interests rather than the governmental interests that the state has set forth. And I think that is exactly what's happened here. Well, it may be. I mean, it may be, but I mean, I guess its own purpose when it's a city and a political organization related to the city is inherently public. And so isn't that the point that... I guess that goes back to your clearly articulated purpose argument, because if it is being acted, even in an anti-competitive way, pursuant to a clearly articulated state purpose, you know, that seems to be under the current law permissible. It may be permissible under the current law, Your Honor. I mean, we do recognize we're asking the court to create some law here. But we think for the reasons articulated in the North Carolina case and Phoebe Putney, it's not as big of an ask as it seems. That is a real concern that the court seems to be focusing on in the last few years. And this case presents a very good example of why that is. And if just to jump to the clear articulation standard, I mentioned this is a disfavored corrupt doctrine meant to be strictly limited, narrowly circumscribed. And we should also keep in mind that the default rule is that antitrust laws do apply against municipalities, which is different from states. States, we do have those federalism concerns. We do have sovereignty principles. But that isn't true for municipalities. There aren't those same federalism concerns, sovereignty concerns. It's only when the municipality can show that it is acting pursuant to that clearly articulated and affirmatively expressed policy. And the court, we think in Phoebe Putney, may have added a more rigorous application to that test. It was worried about courts applying the Halley test, the MidCal test too loosely. And it added the inherent logical or ordinary result of the exercise of authority delegated by the state legislature. And not only that, it's not enough that the state contemplated anti-competitive conduct. It had to do so in the market where the challenge activity took place. And one of the clearest examples supporting that reading is the 11th Circuit's decision from last year in the diverse power, the city of LaGrange, which presented a scenario where the municipality had authority pursuant to state statute to regulate water services and sewage services. Both of those utilities. And the statute anticipated displacing competition in those markets. But then what the municipality did there, the city did, is took it one step further. They attempted to displace competition in a third market, the natural gas market. Council, the only way you can make that analogy is to go back where you started, and I'm sorry I took you off it, when you said that, okay, what they've done here, what the city has done, is to regulate emergency medical services. And that's all. And they are here trying to regulate vehicles. But in fact, the statute says emergency medical services vehicles. Uh, yes, it does, Your Honor, it absolutely- No, I'm just not sure where your argument goes. It was, it is expressly in the statute here. So it has been expressly taken over by the city here. It wants to regulate the vehicle. For sure, yes, Your Honor. We do not contest the statute contemplates or discusses EMS vehicles for sure. But that's certainly within the context of setting up a statewide emergency medical services system. That's the focus. But why is it, Council, why isn't it, why doesn't it further, the statute at issue says its purpose is to ensure that there's continuing emergency medical services. Why doesn't it further that purpose to regulate non, to regulate emergency vehicles used in a non-emergency setting so that there's sufficient revenue to overcome the fact that they don't make enough to do, providing emergency services? I mean, it looks like, and maybe that's not the reason, but it seems to me they probably have a deficit on emergency services because many people are indigent. And so in order not to use other, you know, revenues of the city, they, you know, have higher charges for non-emergency services if they use EMS vehicles. And that may be real bad for the VA. And it may be real bad for taxpayers who aren't rich, but you have to pay for it. But it seems to me to be consistent with that purpose. Your Honor, I would disagree. I think that... You would disagree with the purpose? That's what they clearly are doing, right? Your people want to skim off the less expensive things and provide services for those, right? And so I think that I don't... Your Honor, I don't think our client would want to skim anything, but what I think... What's the charge of the less expensive services? Yes. And I think what's important there is, I think that it highlights why the state was contemplating emergency services when it set up this system. It knew that the free market wouldn't necessarily deliver those services efficiently and for all citizens, unlike the separate market. I think there's little disagreement that there's a... This is a second market for non-emergency transport services. But what Judge Quaylebaum is just telling you is the reason why they would include the non-emergency vehicles in that. And that's a perfectly legitimate reason, isn't it? It may not be one we like, but it's perfectly legitimate. It may be, but I think... And Your Honor, I'm about to run out of time, if I can just... No, sure. I think you have to go back and look at the statute and see if that's clearly articulated in there. And I'd point to section... This will be 111.4, paragraph B, which says, the board shall classify emergency medical services agencies and emergency medical services vehicles by type of service rendered. The state is saying what matters is the type of service rendered, not the form in which it comes, an ambulance or EMS vehicle. When the VA contracts to have EMS vehicles transported to patients, it's doing so for the medical services provided, not... But counsel, you... And I'll let you finish. I know you're over your time and maybe address this coming back. But B says, in addition to the power set forth above, and A lays out all the things that we were talking about before. So it looks like, to the extent you're right about B scope, it's in addition to, and it doesn't change what happens with A. And A is where it seems like all the action is in this issue. And Your Honor, I'm happy to finish now or wait for rebuttal. Why don't you wait for rebuttal, and then you can also talk about whatever the other side said. Thank you. Thank you, Your Honor. Counsel? Good afternoon. May it please the court. My name is Craig Merritt of the Richmond Virginia Bar. I'm here on behalf of Richmond Ambulance Authority to address the antitrust issue. Mr. Marks has reserved some time to talk on behalf of the city about the preemption issue. I'm glad that the colloquy with counsel ended with some of the facts in the record, because it's an important point that hasn't gotten enough focus in these briefs. There are two clusters of facts we would ask the court to look at that are in your record, in your appendix. In the second amended complaint, Metro says at paragraph 36, and this is in the joint appendix at page 21, that EMS vehicles with advanced life support and trained crews can be used for both emergency and non-emergency services. In their brief, opening brief at page six, with regard to the VA, Metro tells you that the VA requires ambulance type transport vehicles with basic and advanced life support equipment in case something goes wrong. Now, it's important because it means that these same vehicles are on the supply side of both the emergency and the non-emergency market. We also know from that same paragraph 36 in the second amended complaint that EMS level transport vehicles with advanced life support are expensive. And thus, we set up the problem. How do you generate a revenue stream sufficient to cover the expense of these vehicles? We know one thing. The metros of the world want no part of that. They don't want to be taking the low revenue stuff, as they told the city in joint appendix at page 385. In their submission to the city, Metro says, Metro has no interest in providing any emergency services to any private residents, cities, or local government within the Commonwealth of Virginia. Thus, the cherry picking problem that municipalities have to deal with because the metros of the world don't want to deal with those low-pay customers. The answer to that is in a second cluster of facts that you'll find in the record having to do with the sovereign authorization that the General Assembly of Virginia gave to municipalities generally and specifically to the city of Richmond that allows them to address this problem. We've already had some discussion of Virginia Code 32.1-1111, but something that is glossed over fairly regularly in this discussion by Metro is the Enabling Act, which is a separate piece of legislation from the Virginia General Assembly. Because remember, we're a Dillon rule state in Virginia. The municipalities don't do anything without legislative authority. And if you look at joint appendix, page 90, working in conjunction with that general state statute, you have an Enabling Act, which further and very specifically authorizes the city to set up an authority that has the power to provide both emergency and non-emergency services. So, the authorization is explicitly there by combination of the statute and the Enabling Act. So, Council, Mr. Merritt, if I could interrupt you. Assume, I want to turn your attention away from the clearly articulated purpose issue for a second. Appreciate the points you've made on that. Your colleague really didn't address this issue, but to me, the thing that made this case maybe different, or I think, you know, definitely different, maybe not different in a way that legally matters. Maybe it does. Is relates to the active supervision issue that North Carolina Dental talks about. And one of the reasons, as I recall, North Carolina Dental, you know, said the state action immunity didn't apply, or it was several reasons, as Judge Mott said, those were private participants. They had their private interests. But also, they weren't accountable politically or relatedly. They weren't accountable politically. So, I really kind of want to deal with that issue, that political accountability. And it seems to me, you know, in theory, you know, Richmond's a political, obviously, as a municipality, their political accountability there. And the RAA's people are appointed by the mayor. And so, there's, you know, arguably, in theory, political accountability there. But the charges that are made to the VA are borne by people outside of Richmond. They're borne by everyone, whether they're, and not even, and even outside of Virginia. So, to the extent there's anti-competitive behavior, and I think it's pretty clearly anti, but, you know, competitive behavior, it hurts, you know, the taxpayers as a whole, who don't have any ability to exercise their displeasure to this type of situation. And that seems different than the other cases, factually, for sure. So, first of all, do you agree that that's a factual difference? And B, are we just supposed to say, because it's never come up, it doesn't matter, or does it matter? I agree that it is a fact. I don't agree that it's a factual difference. It is a fact that when you put any sort of a system in that is anything other than a pure free market free-for-all, there is going to be a reallocation of the cost of the service among classes of people. That's a given. That's true of almost any kind of regulation we can imagine. This is a matter of economic theory. The idea that this is a new issue in state action cases, I don't agree with. Because if you look at any number of state action cases that involve any form of state regulation, costs are imposed on the people who are complaining about the system. That's how you even get to the Parker question. Yeah, but the point of New York, North Carolina Dental, is that if the people who complain can kick the folks who set the system up out of office, then there's some checks and balances there. In this case, it seems like that's something that's missing, or at least it's missing for the vast majority of the people who have to pay the higher cost that the VA incurs. I have no reason to believe that in Halley, the surrounding towns that sued the city of Halley had any ability to elect the city council of the city of Eau Claire. This is not a... So they were... So you're saying in Halley, the complainers, and that's helpful, the people who are complaining are in towns outside the city and therefore couldn't kick the folks who put that system in place? Exactly. So you're saying that's not a difference? I don't think it's a legal distinguishing point. I truly do not. The other thing about... Well, it could be, counsel, it could be a distinguishing point when you have no political body involved, as you did in the North Carolina dental case. It's just different considerations then, because somebody is politically accountable for the regulations here. Maybe not your representative, but the legislature at large, the city itself, and so they're politically accountable, whereas that was not the case in the North Carolina dental situation. Isn't that right? That's right. But the North Carolina dental case, generally speaking, is factually an opposite for this reason. If you look at the whole line of Parker cases, back to the foundation of the doctrine, there has always been a line of cases that you can follow. You go through Goldfarb, you go through Midcow, you go through Parker versus Berger, and FTC v Tycor, and all of those cases are dealing with precisely the problem that you have in North Carolina dental. That is, you have a gauzy cloak of state activity that appears to coincide with what is essentially private, horizontal, anti-competitive conduct by people who are active in the market. That is fundamentally different from an RAA or a municipality, which have a direct authority from the General Assembly to do what they do. And that's why North Carolina dental itself, in Part 3B of that opinion, it specifically identifies the how a municipality a limitation on that rule from active supervision and distinguishes it from the more general Midcow rule that it goes on to apply against that state body. North Carolina dental, fairly read, embraces Howley when it comes to the type of defendants that we're talking about in this case. It embraces Howley and reasserts it with regard to municipalities. Last point, if I may, the Howley test has not been modified by Phoebe Putnam. And the vehicle by which Metro tries to accomplish that is a reading of the 11th Circuit's opinion of diverse power. But I think you need to read diverse power fairly. Reaching to find a circuit split on this, in our view, is a pretty strong reach. In diverse power, you will see a discussion that begins at page 1274. We're at 934 Federal Report of the 1274. It's Part 3B of the opinion. And for several pages, the 11th Circuit talks about Phoebe Putnam in which the Supreme Court reversed the 11th Circuit. And essentially, several pages are spent talking about why had the Supreme Court not moved the ball on them, the 11th Circuit would have been correct. Now, regardless what one thinks about that analysis in diverse power, when the rubber hits the road, when it comes time to make the decision, diverse power itself applies Howley. In the discussion beginning at the bottom of 1276 and continuing through 1277, it embraces and grapples with what were the facts in Howley and what are the facts here? How are they distinguished? How are they the same? It then follows with another aside about how the Supreme Court moved the ball. But then at the end of the day, it says perfectly consistent with the Howley test. We think it's safe to say that the tying of an unrelated service in a different market to the provision of water service falls outside the statute's grant of immunity. In other words, we looked at the statute under the Howley test, and this is simply too far a reach. We cannot infer what Phoebe Putney is telling us it's permitted to do. So we really have to re-overread what happens in diverse power to try to generate a circuit split or an argument that Phoebe Putney abandoned Howley. In fact, Phoebe Putney, if you look at 568 U.S., starting around page 227 and 228, there is a discussion of the Parker test that includes Howley. And then Phoebe Putney says the principle articulated in Boulder controls this case. Why is that? Because Boulder is a case in which the evidence showed that the position of the sovereign was one of complete neutrality. You couldn't find an authorization no matter how hard you tormented or tried to read the statute. That's what controlled in Phoebe Putney. You don't even get to the Howley issue in Phoebe Putney because you can't find anything to analyze in the broad neutral grant of power that's been given. So we think that this court is being invited to take the view of Phoebe Putney's effect on Howley that is really a pretty long stretch. And we would encourage you not to do that because we think it requires you to put a reading on Phoebe Putney that's not fairly borne by the actual language of the opinion. Thank you. Yes, ma'am. Mr. Collick, do you wish to add anything, sir? Good afternoon, your honors. My name is Wart Marks on behalf of the city of Richmond and I'm prepared to address the appellant's preemption argument. It hasn't been brought up by the appellant, but our position is that the district court correctly concluded that the amended complaint failed to allege any conflict between the city ordinance and the Competition and Contracts Act. Competition and Contracts Act requires an executive agency in conducting procurement for services to use competitive procedures in their own request for quotes they put out in this case. They specifically provided as a requirement of that process that any service provider proved that they had acquired a permit under the city's ordinance to directly require compliance with the ordinance in order to be able to... Counselor, we can't hear you. I'm having a hard time hearing. I'm sorry, your honors. Is that any better? Yes. Yes. I apologize. And so our position is that there's no conflict with the ordinance. In addition, the contracting... Mr. Marks, can I ask you a question? Can you hear me? Yes, your honor. It's not about the preemption issue. And if it's unfair, I'm sorry. But I'm just curious. Would your clients... I mean, would the city and the RAA be immune from interference with... I don't even know if Virginia has an interference with prospective contractual relations. Would they be immune from that? Would they be immune from civil conspiracy? Would they be immune from a state unfair trade practices claim? Do you know? And that's probably not really framed. I'm just... But if you know the answer to that, I appreciate it. I don't know the answer to that, Mr. Merritt may. But your honor, frankly, off the top of my head, I don't. I believe they would be. But I've not specifically looked into that issue. Mr. Merritt, do you know the answer to that question? Your honor, I believe that under general principles in Virginia, there would be sovereign and torn immunity, except to the extent it's waived. And there is a statutory provision that in some purposes waives toward exposure for sovereign immunity. But I can tell you, I have not studied that in preparation for this argument. So beyond that, gauzy 35,000 foot response, I get uncomfortable. Thank you, your honor. If I may add something to that question from just a general principle of sovereign immunity with regard to the city, I think clearly the regulation of health care services falls in the realm of being a governmental function. And as a governmental function, the city would be afforded sovereign immunity on general tort claims related to that. As to contractual issues, I've not looked into that. Thank you. All right. And so, your honor, it's our position that this is a competition and contracting broad act that covers many types of contracts. Reasoned in Virginia, Uranium versus Warren. The same sort of reasoning applies where this is one small contracting piece and doesn't support a conclusion that even if there's a conflict between the competition and contract act and the Richmond statute, that that one small area would supersede the purpose of trying to promote competition in the contract. In addition, clearly the VA made a requirement of the request for quotes that anybody that bids on it with the city statute or ordinance. Thank you. Thank you very much. We appreciate your argument. You have anything in rebuttal, sir? Yes, your honor. Thank you very much. First, I want to note that there's no doubt that the services being provided to the VA are non-emergency services. No one contests otherwise.     which is the next item that we're going to look at is the VA's request for quotes. We also have to understand the VA sought to competitively bid this work as an obligation under federal law, in fact, to bid it. But we have a scenario here where they can't go with the bidder they want to go with because this monopoly exists and this has been allowed to perpetuate for really decades. I also want to point out when we consider these questions, the very end of Phoebe Putney talks about with these questions because the doctrines is favored, if there are doubts, there should be resolved in favor or against finding immunity exists. And I think that's important to keep in mind for all these questions. Now, when we look at the statute, the key again is to did the state anticipate displacing competition in the market where the complaint of contact conduct occur? And the statute, the focus is on emergency services. Now, I know council, Mr. Merritt brought up the enabling act. That is simply permission to act in the market. That's a classic older statute. It does not say anything about displacing competition in a non-emergency market. But that's the burden they have to meet. Again, again, state action immunity is a permanent offense. This is the city and RAA's burden at this point. On the active supervision point, again, the Supreme Court repeatedly expressed this concern about these situations where our parties are acting in the same markets that they're regulated and indeed controlled. And North Carolina's Board of Dental Examiners, certainly with respect to the RAA, there's the same lack of political accountability that was a quote, real danger there. Also, functionally, I just want to step back. There's clear differences between emergency services and non-emergency services. I think we all understand that. You call your doctor for some things. You call 911 for other things. And when you call your doctor, sometimes you get that recording beforehand that says, this is an emergency, hang up and dial 911. And it made sense for the state to set up a system to have a plan in place when you do have those emergencies. Now, going to the point about whether these cities, these communities can supplement their budgets based on profits, super competitive profits they derive in other markets, separate markets, I think that does not show an articulated policy to displace competition in that separate market. It doesn't. And again, it emphasizes the fact that there are these two separate markets, one that's really not discussed in the statute. And let me see. Your honors, at this point, I think our main point here is that it's very important to scrutinize this monopoly. That's what the Supreme Court has directed courts to do. A monopoly is perpetuated for decades. And ask is this really what the state intended when it established its state emergency services system? Particularly where it has allowed this community to wield this power to further its own interests, a power that no other community in the state appears to have wielded itself. The VA seeks to do business with Metro Health. It wants to go at the lowest bidder, but it's blocked from doing so. Counsel, your time is expired. You can finish your sentence. Thank you very much. Yes, your honor. You know, with that in mind and the directives of the Supreme Court to nearly circumscribe the disfavored doctrine, we think state action is not available here. Thank you very much. Thank you very much, counsel, for your arguments.
judges: Diana Gribbon Motz, Stephanie D. Thacker, A. Marvin Quattlebaum Jr.